OPINION
Plaintiffs-appellants, Century Surety Company ("Century") and Mary Ann Rabin, Bankruptcy Trustee for the Cleveland Trinidad Paving Company ("bankruptcy trustee"), appeal from a judgment of the Ohio Court of Claims awarding them $147,917.81 in their breach of contract action against defendant/third-party plaintiff, Anthony Allega Cement Contractor, Inc. ("Allega"). Third-party defendant-cross-appellant, the Ohio Department of Transportation ("ODOT") cross-appeals from the judgment of the Ohio Court of Claims.
Plaintiffs' action arises out of the reconstruction of a five-mile stretch of Interstate 90 in Cleveland, Ohio, known as ODOT project No. 794-93 ("the project"). The project involved four distinct processes: (1) removal of the existing asphalt down to the concrete subsurface, (2) repair of the concrete subsurface, (3) paving of the intermediate layer of asphalt, and (4) paving of the final surface layer of asphalt.
In November 1993, Allega was awarded the contract to serve as the general contractor on the project. Although Allega was responsible for all work on the project under its contract with ODOT, the contract permitted Allega to subcontract portions of its work. Allega determined that in addition to serving as the general contractor for the project it would perform the repairs to the concrete subsurface, but would subcontract for the removal of the existing asphalt and all new asphalt paving. In April 1994, Allega subcontracted with Cleveland Trinidad Paving Company ("CTP"); CTP's contract with Allega called for CTP to remove the existing asphalt from the roadway, and then, after Allega had completed repairs to the concrete subsurface, to pave both the intermediate and surface layers of asphalt.
The five-mile stretch of I-90 being repaired in the project consisted of two directions of four-lane freeway separated by a concrete divider. Work on the project proceeded in roughly identical fashion on both sides of the freeway. However, in the interest of simplicity, our discussion of the project will focus on the work performed on one side of the freeway, with the understanding that essentially the same work also was being performed on the other side of the freeway, in the opposite direction. Further, the four lanes on the side of the freeway being discussed will be referred to as lanes one, two, three, and four, where, moving sequentially from left to right, lane one is the lane closest to the concrete divider and lane four is the lane adjacent to the berm.
The original plans and specifications called for work on the project between the beginning of the working year in April 1994 and the winter shutdown in November 1994 to proceed in the following sequence: (1) CTP would remove all existing asphalt from lanes three and four, (2) Allega would perform all necessary concrete repairs to the concrete subsurface below lanes three and four, (3) CTP would remove all existing asphalt from lanes one and two, and (4) Allega would perform all necessary concrete repairs to the concrete subsurface below lanes one and two. In a final three-part step, CTP would place an intermediate layer of asphalt on the entire roadway in the following progression: (a) pave the narrow inner berm, lanes one and two, and a narrow two-foot asphalt wedge, intended to allow traffic to move back and forth between the paved and higher lane two and the unpaved and lower lane three, in a single operation, (b) pave lanes three and four in a single operation, burying the narrow two- foot wedge under the new asphalt being placed on lane three as CTP paved, and (c) pave the outer berm. Work would then end for the winter shutdown. When work resumed in spring 1995, CTP would place a final surface coat of asphalt on the roadway in the same manner that it paved the intermediate layer of asphalt.
When Allega and CTP entered into their respective contracts for the project, ODOT's "Construction and Material Specifications" manual, which is incorporated by reference into both contracts, permitted a paving contractor to utilize up to fifty percent recycled asphalt ("RAP") in the asphalt mixture used to pave an intermediate layer of asphalt ("type II"), and up to thirty percent RAP in the asphalt mixture used to pave a final surface layer of asphalt ("type I").
CTP began work removing the existing asphalt from lanes three and four in April 1994. As the existing asphalt was ground off the roadway, CTP stored the material at its asphalt plant for later use as the RAP to be utilized in making the new asphalt for the project. The asphalt removal went smoothly, and by early May 1994, CTP had removed all existing asphalt from the outer two lanes on both sides of the freeway.
In a letter to Allega dated May 11, 1994, CTP requested an advance payment for the RAP stored at its asphalt plant as delivered but not yet incorporated materials pursuant to ODOT Construction and Material Specification 109.07. Included with CTP's request was an invoice for 39,675 tons of type II RAP at $13.63 per ton, and 9,412 tons of type I RAP at $14.74 per ton. Allega forwarded the request to ODOT. After making a minor adjustment to the RAP quantity included in CTP's invoice, ODOT approved the advance RAP payment. On June 22, 1994, ODOT paid Allega $533,955.25 for type II RAP stored at CTP's asphalt plant and $124,877.28 for type I RAP stored at CTP's asphalt plant. Allega in turn paid these amounts over to CTP.
As Allega started work on the repairs to the subsurface concrete, it discovered the subsurface concrete was in need of far more work than ODOT had anticipated when it prepared the project plans and specifications. By August 1994, all parties realized the additional concrete repairs had put the project behind schedule to such an extent that work on lanes one and two could not be completed before the winter shutdown.
Accordingly, on August 29, 1994, ODOT announced major changes to the work sequence on the project that called for all work on lanes one and two to be postponed until spring 1995, and for only intermediate asphalt to be placed on lanes three and four prior to the 1994 winter shutdown. The changes meant that throughout the winter shutdown, lanes three and four would be paved with intermediate asphalt, while lanes one and two would remain covered in their original asphalt, leaving lanes one and two several inches higher than lanes three and four. In order to reduce the danger associated with traffic moving back and forth between the higher and lower lanes during the hazardous winter driving season, ODOT ordered that the asphalt wedge between the higher lane two and the lower lane three be widened from two to seven feet. Due to its increased width, the seven-foot wedge, unlike the original two-foot wedge, overlapped significantly into both lanes two and three to create a gradually beveled surface between the two lanes. To reduce the impact of the changes on CTP, ODOT agreed to allow CTP to permanently close lane four and to work two additional hours each night.
The changes in the project sequence and the installation of the seven-foot wedge added several additional steps to CTP's intermediate paving operations. Most importantly, because the seven-foot wedge overlapped significantly into lanes two and three, it prevented CTP from paving lanes three and four, and later lanes one, two, and the narrow inner berm, in single operations. Specifically, after Allega completed its concrete work on lanes three and four, the changed project sequence and the installation of the seven-foot wedge caused CTP to conduct its intermediate paving by paving the outside berm and the now permanently closed lane four in a single operation, paving lane three, and paving the seven-foot wedge overlapping lanes two and three before work would then end for the winter shutdown.
Following the resumption of work in spring 1995, CTP began to grind all of the original asphalt off lanes one and two and grind the wedge and new intermediate asphalt off the left half of lane three so as to create a taper between the now higher lanes three and four and lower lanes one and two.
After Allega completed all concrete repairs on lanes one and two, CTP completed its intermediate asphalt paving by paving the narrow inner berm and lane one in a single operation, and paving lane two and the left half of lane three in a single operation. The second half of that operation was made more complex by ODOT's requirement that before the new intermediate asphalt could be put down, CTP had to grind out the tapered remains of the seven-foot wedge and cut a new longitudinal butt joint down the center of lane three, in front of the paving operation, to ensure a proper joint between the new intermediate asphalt and the intermediate asphalt which CTP had put down on lane three the previous fall. According to CTP, that altered paving operation involved more steps and took much longer to complete than the paving operation called for in the plans and specifications, and CTP contends it is entitled to be compensated for its loss of productivity ("lost productivity claim").
Shortly after the addition of the seven-foot wedge and the resulting revised work sequence were announced, CTP notified Allega, who in turn notified ODOT, that CTP expected it would incur additional traffic control costs as a result of adding the seven-foot wedge ("wedge traffic control claim") and closing three full lanes of traffic as necessitated by the changed work sequence ("three lane closure traffic control claim").
Through the fall of 1994, work progressed on the project according to the revised work sequence. During that period, CTP submitted invoices every two weeks for the intermediate asphalt paving performed during the previous two weeks. The invoices covered the cost of all materials, including RAP, used by CTP during the invoice period. Because ODOT had already paid CTP for the RAP as delivered material, ODOT deducted the cost of the RAP used during the invoice period when it paid the invoices.
During the winter shutdown, ODOT announced it was reducing the allowable percentage of RAP to be used in intermediate asphalt from fifty to thirty percent, and it would no longer permit any RAP to be used in surface asphalt. As a result of those changes, ODOT agreed to compensate CTP for the cost of the additional virgin asphalt needed to replace the percentage of RAP that could no longer be used, and for the additional expenses associated with acquiring the materials needed to produce the additional virgin asphalt.
In the spring of 1995, CTP resumed paving the intermediate layer of asphalt according to the revised work sequence. Initially, when CTP submitted its biweekly invoices, ODOT deducted only the cost of the thirty percent RAP used by CTP. However, beginning in July 1995, ODOT began deducting RAP costs from CTP's invoices as if CTP were still using fifty percent RAP in the intermediate asphalt. Despite CTP's repeated protests, ODOT continued to deduct the cost of RAP from CTP's invoices at the fifty percent rate for the balance of the intermediate paving. Further, when CTP began submitting invoices for surface asphalt paving, ODOT deducted an amount equal to thirty percent RAP usage even though CTP was using no RAP in the surface asphalt. Ultimately, ODOT succeeded in deducting an amount equal to the amount it had paid for RAP that was not incorporated in the project.
Although CTP eventually sold the unincorporated RAP for $5 per ton, CTP continued to assert that ODOT had wrongly deducted the cost of the unused RAP from its biweekly payments. According to CTP, it is entitled to recover from Allega the wrongfully withheld amounts, less the amount it obtained from the sale of the unused RAP ("RAP claim").
CTP completed its work on the project in early December 1995. In February 1996, CTP submitted a list of seven claims for additional compensation to Allega. Allega in turn submitted the claims to ODOT. Included in CTP's seven claims were the RAP claim, the two traffic control claims, and the lost productivity claim. Ultimately, ODOT denied all of the claims.
In 1997, CTP brought an action directly against ODOT in the Court of Claims seeking to recover on the RAP claim based on breach of contract and unjust enrichment theories. The action was tried to the court. At the close of CTP's case, the Court of Claims granted ODOT's motion to dismiss CTP's breach of contract claim pursuant to Civ.R. 41(B) on the grounds that no contract existed between CTP and ODOT. On July 15, 1998, the Court of Claims issued a decision and a judgment entry finding for ODOT on CTP's unjust enrichment claim on the grounds that CTP had failed to establish that it had conferred a benefit on ODOT for which ODOT had not compensated CTP.
On June 26, 1998, while CTP's action against ODOT was still pending in the Court of Claims, the bankruptcy trustee filed a breach of contract action against Allega in the Cuyahoga County Court of Common Pleas seeking to recover on CTP's RAP claim, lost productivity claim, and traffic control claims. On July 10, 1998, Allega filed a third-party complaint in the common pleas court seeking contribution and indemnification from ODOT in the event that the bankruptcy trustee prevailed on any of her claims. Pursuant to Allega's petition under R.C.2743.16, the two actions were removed to the Ohio Court of Claims.
On January 29, 1999, Century, a secured creditor of CTP, filed a motion to intervene in the case as a party plaintiff. On February 9, 1999, the Court of Claims granted Century's motion.
Beginning on December 6, 1999, the case was tried to the Court of Claims. On September 21, 2000, the Court of Claims issued a decision and an entry finding for Allega on plaintiffs' RAP and traffic control claims and, accordingly, for ODOT on Allega's claims for indemnification arising out of the RAP and traffic control claims. The Court of Claims found for plaintiffs and against Allega on plaintiffs' lost productivity claim, awarded plaintiffs $100,000, together with prejudgment interest from December 7, 1995, for a total of $147,917.81, and found Allega was entitled to indemnification from ODOT in the same amount. Plaintiffs have appealed, and ODOT has cross-appealed from the judgment of the Court of Claims; Allega has not appealed.
Plaintiffs have assigned the following errors:
 I. THE TRIAL COURT ERRED IN DENYING APPELLANTS' RAP CLAIM RELATED TO ODOT-IMPOSED CHANGED SPECIFICATIONS.
 II. THE TRIAL COURT ERRED IN DENYING APPELLANTS' CLAIM FOR ADDITIONAL TRAFFIC CONTROL COSTS RELATED TO THE PLACEMENT OF THE SEVEN-FOOT ASPHALT WEDGE ADDED TO THE PROJECT BY ODOT IN AUGUST, 1994.
 III. THE TRIAL COURT ERRED IN DENYING APPELLANTS' CLAIM FOR ADDITIONAL TRAFFIC CONTROL COSTS RELATED TO EXTENSIVE THREE-LANE CLOSURES NECESSITATED BY THE ODOT-IMPOSED CHANGED CONDITIONS.
ODOT has assigned the following errors on cross-appeal:
 ASSIGNMENT OF ERROR 1: THE TRIAL COURT ERRED IN FAILING TO FIND THE COURT WAS WITHOUT JURISDICTION TO HEAR THE CLAIM.
 ASSIGNMENT OF ERROR 2: THE TRIAL COURT ERRED IN NOT FINDING CTP'S CLAIM BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS.
 ASSIGNMENT OF ERROR 3: THE TRIAL COURT ERRED IN ITS FAILURE TO FIND CTP'S CLAIM BARRED BY RES JUDICATA.
 ASSIGNMENT OF ERROR 4: THE TRIAL COURT ERRED IN FINDING CTP WAS ENTITLED TO ADDITIONAL COMPENSATION FOR WORK FULLY COMPENSATED AND AGREED UPON BY CHANGE ORDER.
 ASSIGNMENT OF ERROR 5: THE TRIAL COURT ERRED IN THE TIME PERIOD IT CALCULATED PRE-JUDGMENT INTEREST.
We first address ODOT's cross-appeal, as resolution of ODOT's first three assignments of error has the potential to render plaintiffs' appeal moot.
ODOT's first assignment of error asserts the Court of Claims lacked jurisdiction to hear the present action, as Allega filed its petition for removal more than twenty-eight days after it filed its third-party complaint against ODOT.
R.C. 2743.03 (E)(1) provides in relevant part:
 A party who * * * makes the state a third-party defendant in an action commenced in any court, other than the court of claims, shall file a petition for removal in the court of claims. The petition shall state the basis for removal, be accompanied by a copy of all process, pleadings, and other papers served upon the petitioner, and shall be signed in accordance with Civil Rule 11. * * * A petition for removal based on third-party practice shall be filed within twenty-eight days after the filing of the third-party complaint of the petitioner.
In addition, C.C.R. 4(B) provides that "[a] petition for removal based on third-party practice shall be filed within twenty-eight days after filing of the third-party complaint of the petitioner."
Pointing to the mandatory "shall" which appears in R.C. 2743.03(E)(1) and C.C.R. 4(B), ODOT argues that the requirement in these provisions that a petition for removal be filed within twenty-eight days after the filing of the petitioner's complaint is jurisdictional. Because Allega filed its petition for removal thirty-five days after it filed its third-party complaint against ODOT, ODOT contends the Court of Claims was without jurisdiction to hear this action.
This court has consistently held that the time limit for filing a petition for removal set forth in R.C. 2743.03(E)(1) and C.C.R. 4(B) is procedural rather than jurisdictional. State v. Reynolds (1982),7 Ohio App.3d 59, 62; Jacobs v. Shelly Sands, Inc. (1976),51 Ohio App.2d 44, 46-47. ODOT has cited no authority to the contrary. Allega's failure to timely file its petition for removal did not deprive the Court of Claims of jurisdiction over this matter. ODOT's first assignment of error is overruled.
ODOT's second assignment of error asserts the Court of Claims erred in failing to dismiss plaintiffs' claims as barred by the statute of limitations. It is somewhat unclear whether ODOT is arguing that plaintiffs' claims against Allega, or rather Allega's claims for indemnification against ODOT, were filed after the statute of imitations had run. The confusion arises from ODOT's seeming application of the two-year statute of limitations set forth in R.C. 2743.16 to both aspects of the case.
To the extent ODOT contends plaintiffs' claims against Allega are barred by the statute of limitations, its argument fails. Were plaintiffs' claims against Allega governed by R.C. 2743.16's two-year statute of limitations as ODOT seems to assert, a colorable argument could be made that the claims were filed more than two years after they accrued. Plaintiffs' claims against Allega, however, are not governed by R.C. 2743.16, but by the fifteen-year statute of limitations set forth in R.C. 2305.06 for claims on written contracts between private parties. Given that the bankruptcy trustee filed her complaint asserting CTP's claims against Allega on June 26, 1998, less than five years from when CTP and Allega entered into the underlying contract, plaintiffs' claims could not possibly have been filed more than fifteen years after they accrued.
To the extent that ODOT is arguing that Allega's claims against it were filed after the two-year statute of limitations in R.C. 2743.16 had expired, its argument applies the wrong accrual time. Relying on the Ohio Supreme Court's decision in Royal Electric Const. Corp. v. Ohio State Univ. (1995), 73 Ohio St.3d 110, ODOT asserts Allega's claims against ODOT accrued in the fall of 1995, when the paving work on the project was substantially complete. In Royal Electric, the Supreme Court held that "[i]n a case involving breach of contract where liability is determined and damages are awarded against the state, the aggrieved party is entitled to prejudgment interest * * * for the period of time between accrual of the claim and judgment, regardless of whether the judgment is based on a claim which was liquidated or unliquidated and even if the sum due was not capable of ascertainment until determined by the court." Id. at syllabus.
ODOT, however, asserts that Royal Electric also holds that damage claims in construction contract cases accrue as a matter of law upon substantial completion of the work at issue. Building on that premise, ODOT further contends claim accrual is logically the same for purposes of both prejudgment interest and the statute of limitations. Therefore, ODOT continues Allega's claims accrued, and the statute of limitations on those claims began to run in the fall of 1995, when CTP's work on the project was substantially complete.
While ODOT correctly asserts a claim accrues at the same point in time for prejudgment interest and statute of limitation purposes, ODOT's statute of limitations argument nonetheless fails: Royal Electric does not hold construction contract claims accrue as a matter of law on substantial completion of the work.
Unquestionably, Royal Electric stated that the various claims in that case accrued on substantial completion of their associated projects. In so stating, Royal Electric was merely reiterating factual findings the trial court made in the case before it. Specifically, in applying its holding regarding the entitlement to prejudgment interest to the facts before it, the court in Royal Electric noted the trial court had determined that "the damages sustained by [the plaintiff] as a result of the delays and other problems associated with the projects accrued * * * at the time that [the plaintiff] had substantially completed each of the projects." The discussion of accrual and substantial completion did not, as ODOT suggests, change the law with respect to the time a claim accrues, but merely indicates that, in the particular case, the plaintiff's claims had, as a factual matter, accrued when the various projects were substantially complete.
Moreover, Allega's claims against ODOT are not construction contract claims, but indemnification claims which did not accrue at the same time as plaintiffs' claims. Generally, claims for money owed on a contract, such as plaintiffs' claims against Allega, accrue when they are finally denied by the defendant. Osborn Co. v. Dept. of Adm. Serv. (1992),80 Ohio App.3d 205, 208. However, indemnification claims such as those brought by Allega against ODOT, do not accrue until the party seeking indemnification is determined to be liable. See Firemen's Ins. Co. of Newark, New Jersey v. Antol (1984), 14 Ohio App.3d 428, 429; Beale v. Applied Coatings International, Inc. (Sept. 29, 1988), Franklin App. No. 88AP-230, unreported. Because Allega sued ODOT before it was found liable to CTP, Allega's claim for indemnification is timely under R.C. 2743.16. ODOT's second assignment of error is overruled.
In its third assignment of error, ODOT asserts Allega has no claims for indemnification against it, as the Court of Claims' judgment for ODOT in CTP's previous action serves to bar plaintiffs' present claims against Allega pursuant to the doctrine of res judicata. In response, plaintiffs initially assert ODOT may not argue the doctrine of res judicata, as Allega did not raise the defense of res judicata in the trial court.
Res judicata is an affirmative defense that is waived if it is not raised in a party's pleading or amended pleading. Jim's Steak House, Inc. v. City of Cleveland (1998), 81 Ohio St.3d 18, 20-21. Plaintiffs argue Allega did not raise res judicata in the trial court, and thus ODOT may not raise the defense on appeal. Plaintiffs' argument, however, overlooks the effect of Civ.R. 14 on the present action.
Civ.R. 14 provides in relevant part that a "third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim." Accordingly, in the present case, because Allega, the third-party plaintiff, had a possible res judicata defense to plaintiffs' claims, ODOT, the third-party defendant here, was entitled to raise that defense against plaintiffs. Because ODOT raised the defense of res judicata in its answer to Allega's third-party complaint, ODOT properly may contend on appeal that plaintiffs' claims against Allega are barred by the doctrine of res judicata.
The doctrine of res judicata embraces both claim preclusion and issue preclusion, historically known as estoppel by judgment and collateral estoppel, respectively. Grava v. Parkman Township (1995),73 Ohio St.3d 379, 381. ODOT asserts the bankruptcy trustee's contract claims against Allega are barred by both claim and issue preclusion. Claim preclusion provides that a valid, final judgment rendered on the merits after a fair and full opportunity to litigate all claims bars all subsequent actions between the same parties or their privies arising out of the transaction or occurrence that gave rise to the prior action. Id. at 382-383. In contrast, issue preclusion provides that an issue or a fact that was fairly, fully, and necessarily litigated and determined in a prior action, may not be drawn into question in a subsequent action between the same parties or their privies. Brady v. Brady (June 6, 1997), Montgomery App. No. 16213, unreported.
Neither claim preclusion nor issue preclusion applies here. Claim preclusion will not bar the contract claims plaintiffs brought against Allega in this action, as CTP's prior action did not provide a full and fair opportunity to litigate those claims. Similarly, issue preclusion does not apply because ODOT has pointed to no issues relevant to plaintiffs' contract claims in the present action which were fully and fairly litigated in the previous action.
More particularly, CTP brought a contract claim against ODOT in the prior action. However, neither that claim, nor any of the contract claims which plaintiffs have brought against Allega in the present action, could have been fully and fairly litigated and decided on the merits in CTP's previous action against ODOT, as no contract existed between CTP and ODOT. While the Court of Claims' dismissal in the previous action pursuant to Civ.R. 41(B) technically "operates as an adjudication upon the merits unless the court, in its order for dismissal, otherwise specifies," Civ.R. 41(B)(3), the only issue the Court of Claims determined or could determine relative to CTP's contract claim was CTP's lack of privity with ODOT. CTP did not have any opportunity to litigate the merits of its contract claim because CTP did not have a contract with ODOT.
Indeed, the Court of Claims' decision in the prior action specifically noted that the issue of "[w]hether or not plaintiff has a valid claim against Allega is not an issue for this court to decide," thereby confirming the prior dismissal of CTP's contract claim was not intended to have a preclusive effect on any subsequent claims brought by CTP or its privies against Allega.
ODOT argues, however, that the Court of Claims expressly ruled on CTP's contract claim in the prior action when it stated that "[t]he evidence in this case establishes that [ODOT] paid Allega, its principal contractor, all sums due and owing under the construction contract for the work performed by [CTP], including additional sums necessitated by the change in the specifications." ODOT contends the Court of Claims' statement should be given issue preclusive effect.
The Court of Claims' statement was made in the context of deciding CTP's unjust enrichment claim, and after the court had dismissed CTP's contract claim. Whether CTP had conferred a benefit on ODOT for which CTP had not been compensated was pertinent to CTP's unjust enrichment claim. Whether ODOT had paid Allega all amounts due for CTP's work under its contract with Allega simply was not before the court. Consequently, we can only conclude that the Court of Claims' statement is inartful dicta unnecessary to the court's judgment on CTP's unjust enrichment claim. As a result, issue preclusion is inapplicable to the statement. Williams v. Chippewa Roofing, Inc. (Aug. 20, 1997), Medina App. No. 96CA0089, unreported. ODOT's third assignment of error is overruled.
ODOT's fourth assignment of error challenges the Court of Claims' award of damages to plaintiffs on their lost productivity claim. Specifically, ODOT contends Change Order 31 was intended to compensate CTP for all costs associated with the changed work sequence and installation of the seven-foot wedge, CTP agreed to Change Order 31, and plaintiffs are therefore barred from seeking additional compensation associated with the changed work sequence or the installation of the seven-foot wedge.
Where the parties to a construction contract agree to a change order which they intend to provide complete compensation for a given change in the project, the party being compensated by the change order will be contractually foreclosed from seeking additional compensation related to that same project change. DiGioia Brothers Excavating, Inc. v. Cleveland Dept. of Public Utilities, Div. Of Water (1999), 135 Ohio App.3d 436,454. Here, however, the evidence is overwhelming that neither ODOT nor Allega ever contemplated that Change Order 31 would cover all additional costs imposed by the changed job sequence and installation of the seven-foot wedge. Indeed, on its face, Change Order 31 purports to authorize additional compensation only for the additional materials and work required to install and remove the seven foot wedge. The order does not discuss any other cost and does not contain an integration clause. Consequently, Change Order 31 does not bar plaintiffs from pursuing CTP's claim for lost productivity. ODOT's fourth assignment of error is overruled.
ODOT's fifth assignment of error asserts the Court of Claims should not have awarded plaintiffs prejudgment interest pursuant to R.C.2743.18(A)(2), which provides:
 The court of claims, in its discretion, may deny prejudgment interest for any period of undue delay between the commencement of the civil action and the entry of a judgment or determination against the state, for which it finds the claimant to have been responsible.
ODOT contends the Court of Claims should not have awarded plaintiffs prejudgment interest, as CTP's not bringing its contract claims against Allega in the prior action caused undue delay between the commencement of that action and the judgment against ODOT in the current action.
While CTP's failure to bring its contract claims against Allega in the prior action delayed the final judgment against ODOT, the Court of Claims' decision to grant or deny prejudgment interest pursuant to R.C.2743.18(A)(2) may be reversed only on a finding of an abuse of discretion. R.C. 2743.18(A)(2). An abuse of discretion connotes more than an error of judgment; it implies a decision which is without a reasonable basis, and one that is clearly wrong. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Here, plaintiffs had a legitimate claim to prejudgment interest. Moreover, the state had use of plaintiffs' money for the period of the delay. In essence, the Court of Claims' award only returns to plaintiffs the money the state would not have earned had plaintiffs commenced suit earlier. Under those circumstances, we cannot say that the Court of Claims' decision to award such interest was without any reasonable basis or was clearly wrong. ODOT's fifth assignment of error is overruled.
Having overruled ODOT's five assignments of error, we now turn to plaintiffs' assignments of error.
In their first assignment of error, plaintiffs challenge the Court of Claims' denial of their RAP claim. The facts surrounding plaintiffs' RAP claim are not in dispute. Rather, the dispute over the RAP claim centers on the legal significance of ODOT's advanced RAP payment and its subsequent recoupment of a portion of that payment through deductions from CTP's biweekly progress payments. Plaintiffs contend that when ODOT made the advance payment for the RAP delivered and stored at CTP's asphalt plant, the RAP became ODOT's property by operation of R.C. 5525.19, and that ODOT's subsequent recoupment of part of the RAP payment essentially forced CTP to repurchase the unincorporated RAP.
The Court of Claims found that the RAP claim was a claim for lost profits expressly excluded by ODOT Construction and Material Specification 104.02, which provides:
 The Department reserves the right to make, at any time during the progress of the work, such increases or decreases in quantities * * * as may be found to be necessary or desirable. Such increases or decreases * * * shall not invalidate the contract nor release the surety, and the Contractor agrees to perform the work as altered, the same as if it had been a part of the original contract.
 Unless such * * * increases or decreases materially change the character of the work to be performed or the cost thereof, the altered work shall be paid for at the same unit prices as other parts of the work. No claim shall be made by the Contractor for any loss of anticipated profits * * * by reason of any variation between the approximate quantities and the quantities of work as done. (Emphasis added.)
The provision shifts to the project contractors the risk of economic loss resulting from ODOT-caused deviations between the amount of a given material called for in an ODOT contract and the amount of materials actually used on the project. Under the provision, had ODOT not paid for the RAP in advance of its use, but paid only for RAP as it was actually used on the project through its biweekly progress payments to CTP, the difference between the contract value of the quantity of RAP originally called for under the contract and the contract value of the RAP actually used on the project would have constituted lost anticipated profits, and plaintiffs would have been unable to recover them.
ODOT, however, did not pay for the RAP as it was incorporated into the project, but made an advance lump sum payment for all of the RAP originally expected to be used in the project. Former R.C. 5525.19, in effect during the contract period, provided with respect to advance payments for delivered but not yet incorporated materials as follows:
 [T]he director may allow and pay to a contractor a sum not exceeding ninety-two per cent of the value of material delivered on the site of the work, or in the vicinity thereof, but not yet incorporated therein, provided such material has been inspected and found to meet the specifications. When an estimate is allowed on account of material delivered on the site of the work or in the vicinity thereof, but not yet incorporated therein, such material shall become the property of the state, but if such material is stolen, destroyed, or damaged by casualty before being used, or for any reason becomes unfit for use, the contractor shall replace the material at his own expense. (Emphasis added.)
R.C. 5525.19 presumably is intended to protect the state by ensuring that if a contractor declares bankruptcy during a construction project, unused materials for which ODOT has paid the bankrupt contractor in advance will not become part of the bankruptcy estate, but will be the property of the state. R.C. 5525.19 apparently seeks to accomplish that goal by transferring ownership of certain construction materials to the state by operation of law. Nothing in the statute suggests the transfer of ownership occurs only when it works to the benefit of the state.
When ODOT paid CTP in advance for the RAP stored at its asphalt plant, the RAP became the property of ODOT by the operation of R.C. 5525.19. Once ODOT purchased the RAP from CTP, the difference between the contract value of the quantity of RAP originally called for under the contract and the contract value of the RAP actually used on the project was no longer anticipated profit, but was profit which CTP had actually realized. Because plaintiffs' RAP claim involves realized, rather than anticipated profits, ODOT Construction and Material Specification 104.02 does not apply. Accordingly, the economic loss resulting from ODOT's purchase of more RAP than it ultimately allowed to be used on the project must be borne by ODOT. ODOT had no right to recoup its excess RAP payment, and the Court of Claims erred in denying plaintiffs' RAP claim. Plaintiffs' first assignment of error is sustained.
Plaintiffs' second and third assignments of error challenge the Court of Claims' denials of plaintiffs' wedge and three-lane traffic control claims, and they will be addressed together. Plaintiffs contend the court should have granted their traffic control claims, as they presented sufficient evidence to support the claims.
Plaintiffs correctly assert they presented sufficient evidence to support a judgment for plaintiffs on both claims, but the court did not deny the claims because insufficient evidence was presented to support them. Instead, the court denied plaintiffs' claims because it found ODOT's evidence refuting the claims was more compelling than plaintiffs' evidence in support of them. ODOT's expert witness, Ronald Cogburn, testified that neither the installation of the seven-foot wedge nor the three-lane closure caused CTP to incur any additional traffic control cost. In fact, according to Cogburn, the project as built required less traffic control than would have been required under the original plans.
In the final analysis, the Court of Claims simply chose to give more weight to ODOT's evidence than to the testimony plaintiffs presented on the claims. The court was in the best position to determine the credibility of the competing witnesses and assign weight to their testimonies. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. Where the court's determination is supported by competent, credible evidence, as it is here, this court will not disturb the trial court's determinations with respect to witness credibility and weight. Blessing v. Bowersock (Dec. 12, 2000), Franklin App. No. 00AP-635, unreported. Plaintiffs' second and third assignments of error are overruled.
Having overruled ODOT's five assignments of error, and plaintiffs' second and third assignments of error, but having sustained plaintiffs' first assignment of error, we affirm in part and reverse in part the judgment of the trial court, and remand this matter to the Ohio Court of Claims for further proceedings consistent with this opinion.
BROWN and TYACK, JJ., concur.